THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: March 29, 2009



_____
Honorable Pamela Pepper
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN RE:   MARCIA R. GWALTNEY, | Case No. 07-29919-pp |
| Debtor. | Chapter 13 |

**ORDER OVERRULING CREDITOR CSMC, INC.'S OBJECTION
TO CONFIRMATION OF THE CHAPTER 13 PLAN**

The debtor and her then-boyfriend applied for a mortgage loan, using the debtor's boyfriend's mother's name as the loan applicant. Immediately after the closing, the property was quit-claimed to the debtor, her boyfriend and the debtor's mother. The debtor and her boyfriend made no mortgage payments, and the creditor foreclosed. The debtor then filed for bankruptcy, and proposed to cure the mortgage arrearage in her Chapter 13 plan. The creditor objected to confirmation of the plan, arguing that the post-purchase transfer of the property to the debtor and her boyfriend violated the due-on-sale clause of the mortgage and to allow the debtor to pay the mortgage arrears in her Chapter 13 plan would impermissibly modify the creditor's rights in violation of

1

11 U.S.C. § 1322(b)(2). As it will explain in detail below, the Court overrules the creditor's objection.

## I. **FACTUAL BACKGROUND**

The debtor, Chad Sekuris and Cathy Burgoyne[1] testified at the evidentiary hearing on this matter.

The debtor and her then-boyfriend (now husband) Chad Sekuris[2] applied for a home loan with Central States Mortgage Company ("CSMC") to purchase the property at 7849 Green Bay Road in Kenosha, Wisconsin, ("property") but did not qualify. (Test. of Marcia Gwaltney.) The debtor testified that the loan officer, Tisha Morgan, suggested that Mr. Sekuris still could obtain the loan by using the power of attorney he possessed for his mother, Carolyn Sekuris, to get the loan in his mother's name. He could use that loan to purchase the property. Ms. Morgan also told the couple that then Mr. Sekuris could use the power of attorney to convey the property from his mother's name to himself and the debtor via a quit-claim deed.

Mr. Sekuris refinanced his prior home to obtain the necessary down

---

[1] Cathy Burgoyne is a staff attorney for the creditor, and testified as the creditor's custodian of records. She testified that she was not present at the closing on the sale of the property at issue and that she did not have any first-hand knowledge of that event.

[2] The debtor and Mr. Sekuris married after the debtor filed her bankruptcy case, and the debtor changed her name to Marcia Sekuris. For clarity's sake, this decision will refer to the debtor by her maiden name, Marcia Gwaltney.

payment, and put down $70,273.19 toward the purchase of the property. (Ex. 1 at 3; Test. of Marcia Gwaltney.) According to the debtor, Ms. Morgan suggested that Mr. Sekuris do this. (Test. of Marcia Gwaltney.) As Ms. Morgan also had suggested, the couple then applied for the loan in Carolyn Sekuris' name. (Ex. 100 at 1.) Ms. Morgan assisted the debtor and Mr. Sekuris in filling out the loan application, and it was approved. (Ex. 100 at 4.)

At the closing on March 29, 2006, Michele Petersen, a representative from the title company, and Ms. Morgan were present. (Test. of Marcia Gwaltney; Test. of Chad Sekuris; Ex. 1 at 3.) CSMC did not choose the title company. Rather, it had a policy of using the seller's title company as its agent to complete the closing. (Test. of Cathy Burgoyne.) The debtor testified that both Ms. Petersen and Ms. Morgan knew that Mr. Sekuris intended to transfer the home into the couples' names immediately after completing the purchase under Carolyn Sekuris' name. She further testified that after the closing, Michelle Petersen produced a piece of paper that the debtor and Mr. Sekuris signed, understanding that this would put their names on the title of the property. According to the debtor, Tisha Morgan was in the room at the time that the couple signed this paper. The debtor testified that after they signed the paper, she gave the paper back to Michelle Petersen, who arranged for the drafting of the quit-claim deed that transferred the property to the couple. (Test. of Marcia Gwaltney.)

Mr. Sekuris' testimony regarding the details surrounding the execution of

the quit-claim deed differed somewhat from the debtor's. Mr. Sekuris testified that no one orally informed the couple at the closing that they could not transfer the property into their names without the lender's consent. (Test. of Marcia Gwaltney; Test. of Chad Sekuris.) He stated that he believed that someone had prepared the quit-claim deed in advance of the closing, and that the only thing that he and the debtor needed to do at the closing to have the property titled in their names was to sign the quit-claim.

Mr. Sekuris testified that after the closing, Tisha Morgan and Michele Petersen told the couple to go "upstairs" to execute the quit-claim deed. Mr. Sekuris did not remember if Michele Petersen and Tisha Morgan accompanied them "upstairs." (Michele Petersen's name appears as the notary who notarized the signatures on the quit-claim deed.) (Test. of Chad Sekuris; Ex. 107.) Mr. Sekuris testified that he took all of the closing documents with him when he went "upstairs." He testified that he went "upstairs" to another office in the same building in which the closing had taken place, and told the worker at that office that the couple needed a quit-claim deed. He then signed a piece of paper in that office, after which he and the debtor left the building. (Test. of Chad Sekuris.) He could not remember whether he left the office building with the quit-claim deed, or whether the deed was mailed to him at a later date. (Test. of Chad Sekuris.)

On April 6, 2006 three documents were recorded in Kenosha County. The first document was the warranty deed from the seller of the property to

Carolyn Sekuris, and that document was recorded at 2:36 p.m. (Ex. 1 at 1.) The second document was the mortgage between Carolyn Sekuris and CSMC, and this document was recorded at 2:38 p.m. (Ex. 105 at 1.) The last document was the quit-claim deed transferring the property from Carolyn Sekuris to Carolyn Sekuris, Chas Sekuris and Marcia Gwaltney. (Ex. 107.) The quit-claim deed was recorded at 2:39 p.m. (Ex. 107.)

CSMC's representative, Cathy Burgoyne, testified that she believed that Carolyn Sekuris had gone in to the offices of CSMC at one point and signed preliminary loan documents. (Test. of Cathy Burgoyne.) She testified that the basis for this belief was her recollection that CSMC's file for the loan contained a photocopy of Carolyn Sekuris' driver's license and a signature that Ms. Burgoyne believed to be that of Carolyn Sekuris. (Test. of Cathy Burgoyne.) Neither of these documents were offered as a part of the record. Mr. Sekuris testified that Carolyn Sekuris never went to the offices of CSMC regarding the purchase of the property on Green Bay Road. (Test. of Chad Sekuris.)

Ms. Burgoyne testified that CSMC provided the closing company with instructions on how to conduct the closing. (Test. of Cathy Burgoyne; Ex. 101.) She testified that at no time were there any instructions from CMSC to the closing agent to execute, or assist in the execution of, a quit-claim deed from Carolyn Sekuris to Carolyn Sekuris, Chad Sekuris and Marcia Gwaltney.

After the closing, someone from CSMC reviewed the closing documents and discovered several mistakes that needed to corrected. (Test. of Cathy

5

Burgoyne; Test. of Marcia Gwaltney.)  As a result of one of the mistakes, CSMC informed Mr. Sekuris that the mortgage payments would have to be made to a different lender than the lender that originally agreed to finance the mortgage. (Test. of Marcia Gwaltney.)  CSMC contacted Mr. Sekuris to discuss correcting these mistakes, but Mr. Sekuris refused.  (Test. of Cathy Burgoyne.)   The debtor then called Tisha Morgan to find out what went wrong.  (Test. of Marcia Gwaltney.)  According to the debtor, CSMC never informed either her or Mr. Sekuris of the name or address of the new lender.

While no one orally informed the debtor that the property could not be transferred without the lender's consent, paragraph 18 of the mortgage contained the following language:

> **Transfer of Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by lender if such exercise is prohibited by Applicable Law.

(Ex. 105, ¶18.)  Mr. Sekuris initialed the bottom of page 7 of the mortgage, the page that contains paragraph 18.  (Ex. 105 at 7.)

The final lines of the mortgage read, "BY SIGNING BELOW, Borrower

6

accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it." (Ex. 105 at 9.) Below these lines, there is a space for the borrower's signature. There is a signature in that space, and typed underneath the signature are the words, "Carolyn J. Sekuris BY Chad Sekuris AS ATTORNEY-IN-FACT." (Ex. 105 at 9.) The page is notarized by Michele J. Peterson, who states that the instrument was acknowledged before her by "Carolyn J. Sekuris by Chad Sekuris as attorney-in-fact." (Ex. 105 at 9.)

The debtor and Mr. Sekuris never made any mortgage payments, and CSMC never received any payments on this loan. (Test. of Cathy Burgoyne.) CSMC foreclosed and sold the property at a sheriff's sale on November 28, 2007. (Ex. 106.)

Subsequent to the sheriff's sale, but prior to confirmation of that sale, the debtor filed for Chapter 13 relief, and proposed in her Chapter 13 plan to pay the mortgage arrearage through the plan. CSMC objects to the debtor's Chapter 13 plan, alleging that the property was transferred to her and Mr. Sekuris without CSMC's permission and hence in violation of the due-on-sale clause in the mortgage. CSMC argues that to allow the debtor to pay the arrearage in her Chapter 13 plan would be to allow her to modify CSMC's rights to enforce paragraph 18 of the mortgage in violation of § 1322(b)(2).

II. **LEGAL ANALYSIS**

The language quoted from paragraph 18 of the mortgage is what is

7

known as a "due-on-sale" clause.  A "due-on-sale" clause is an "acceleration" clause.  That is, it provides that if certain events occur, the lender has the right to "accelerate" the loan, and to require the borrower to pay the full amount of the loan immediately.  The event which triggers acceleration in a "due-on-sale" clause is the borrower selling the property without the lender's consent.

In the current case, the creditor argues that the due-on-sale clause of paragraph 18 of the mortgage requires that the entire outstanding balance of the loan be paid in full, because the borrower–Carolyn Sekuris–transferred the property without the creditor's consent.  The creditor argues that if this Court allows the debtor to pay that outstanding balance over five years, as the plan proposes, the result would be to nullify the due-on-sale clause.  Such a nullification would, the creditor argues, impermissibly modify the creditor's rights under the mortgage, in violation of 11 U.S.C. § 1322(b)(2).

Thus, the first question the Court must answer is whether the due-on-sale clause itself is valid and enforceable.  If the clause is enforceable as a general rule, the Court must next determine whether a party who obtains property in violation of a due-on-sale clause can pay the debt on that property over time through a Chapter 13 plan.  If the answer to this question is yes, then whether the debtor in this case obtained the property in violation of the due-on-sale clause is not relevant.  On the other hand, if the answer to the question is no, the Court must determine whether the debtor in this case obtained the property in violation of the due-on-sale clause.

**A.   The Wisconsin Supreme Court Has Held that Due-On-Sale Clauses Do Not, In and Of Themselves, Violate Public Policy.**

The Bankruptcy Code is silent with regard to whether due-on-sale clauses are valid or enforceable.  Because state law generally governs rights in property, s*ee* Butner v. U.S., 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."), the Court looks to Wisconsin law to determine whether a clause such as the one in this mortgage is enforceable.

In Mutual Federal S & L Ass'n v. Wisconsin Wire Works, 58 Wis.2d 99, 106-107 (1973), the Wisconsin Supreme Court considered the question of whether a due-on-sale clause violated public policy.  The court, citing its previous decision in Grootemaat v. Bertrand, 192 Wis. 519 (1927), stated that "it appears well settled that explicit contractual obligations [such as due-on-sale clauses] may accelerate the obligation to pay the debt in full and are not contrary to public policy."  Mutual Federal S & L Ass'n v. Wisconsin Wire Works, 58 Wis.2d at 106.  *See also*, National Housing Act, at 12 U.S.C. § 1701j-3(b)(1) ("Notwithstanding any provision of the constitution or laws (including judicial decisions) of any State to the contrary, a lender may, subject to subsection (c) of this section, enter into or enforce a contract containing a due-on-sale clause with respect to a real property loan.")

Thus, under Wisconsin law, a due-on-sale clause does not violate public policy as a general rule.

**B.   The Court Concludes that a Debtor Who Obtains Property in Violation of the Due-On-Sale Clause May "Cure" that Default**

9

**Through the Chapter 13 Plan Without Violating the Anti-Modification Provision of 11 U.S.C. § 1322(b)(2).**

The creditor argues that allowing the debtor to pay the debt through the Chapter 13 plan would "modify" its rights under the mortgage contract–specifically, the rights it obtained by way of the due-on-sale clause–in violation of § 1322(b)(2). But § 1322(b)(2) does not exist in a vacuum. The Court begins by looking not only at § 1322(b)(2), but also at §§ 1322(b)(3) and (b)(5). In pertinent part, these provisions state as follows:

> (b) Subject to subsections (a) and (c) of this section, the plan may . . .
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;
>
> (3) provide for the curing or waiving of any default;
>
> \* \* \* \* \*
>
> (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due. . . .

11 U.S.C. § 1322(b)(2), (b)(3), and (b)(5).

So–§ 1322(b) prohibits a debtor from using the Chapter 13 plan to "modify the rights" of the mortgagee, but allows the debtor to use the plan to "cure" a "default." As the United States Supreme Court has noted, the

10

Bankruptcy Code does not define the term "rights." *See* <u>Nobelman v. Am. Sav. Bank</u>, 508 U.S. 324, 329 (1993). Resort to Black's Dictionary tells us that a "right" is, among other things, "[a] legally enforceable claim that another will do or will not do a given act." <u>Black's Law Dictionary</u> 1347 (8th ed. 2004). The Supreme Court has said that courts must look to the relevant mortgage instruments themselves to figure out what legally enforceable claims the mortgagee has that are protected from modification. <u>Nobelman</u>, 508 U.S. at 329, 330

While the debtor can't use a plan to modify a home mortgage creditor's "rights," § 1322(b)(5) does allow a debtor use that plan to "cure" "any default within a reasonable period of time." The Bankruptcy Code does not define the word "default." But generally, in the legal world, "default" is a failure to perform some sort of legal obligation. Black's Law Dictionary defines the noun as "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." <u>Black's Law Dictionary</u> 449 (8th ed. 2004).

In this context, then, what "right" or "rights" does the mortgagee obtain when it enters into a mortgage contract that contains a due-on-sale clause? First, it obtains the right to prohibit the original mortgagor from selling the property without its consent, and second, it obtains the right to accelerate the debt if the original mortgagor violates the first right. At bottom, the mortgagee obtains the right to reduce the risk of default in the future. When a mortgagee demands, as part of the mortgage bargain, a due-on-sale clause, it does so

11

because it obtains the benefit of being able to calculate its risk. Presumably a mortgagee would not issue a loan to the original borrower without first ascertaining the likelihood that the original borrower would default. A due-on-sale clause ensures that the mortgagee can conduct that same risk analysis for anyone to whom the original borrower might wish to sell the property, by granting it the "right" to approve the transfer before it takes place. The clause further guarantees the mortgagee that if the original borrower transfers the property without allowing for such a risk analysis, the mortgagee can cut its risk by exercising its "right" to collect the full amount of the debt immediately.

So it is these rights–the right to approve a sale to subsequent buyers, and the right to full payment of the debt immediately if the mortgagor breaches that right–that § 1322(b)(2) prohibits a debtor from modifying by way of a Chapter 13 plan. The first right–the right to approve a sale to subsequent buyers–is one that already will have been modified by the time this issue comes up in a Chapter 13 context. The original mortgagor already will have deprived the mortgagee of its right to approve the sale to the debtor, by transferring the property to the debtor without the mortgagee's consent. The second right–the mortgagee's right to full payment of the debt immediately upon the unauthorized transfer–presumably also will have been modified by the time the issue arises. Had the original mortgagor paid the loan in full upon the unauthorized transfer, presumably the mortgagee would not be a creditor in the bankruptcy.

12

So the rights of a mortgagee whose collateral has been sold in violation of a due-on-sale clause already will have been modified before the debtor files a Chapter 13 plan. For that reason, this Court does not agree that a Chapter 13 plan proposed by a debtor who obtained a property in violation of a due-on-sale clause "modifies" the creditor's rights by proposing to pay arrearages through that plan. The creditor's rights under the due-on-sale clause were modified before the debtor filed the plan–in many cases, such as the one at bar, before the debtor filed the petition.

Rather, a creditor who objects to confirmation of such a plan on the grounds that the plan "modifies" its rights in violation of § 1322(b)(2) is, in this Court's view, actually objecting to the fact that the original mortgagor "defaulted" on his or her obligation to obtain consent before transferring the property, and defaulted on his or her obligation to pay the loan in full upon conducting the unauthorized transfer. It is objecting to the fact that the debtor is proposing to "cure" that past default–that failure to pay the debt in full upon the unauthorized transfer–by paying the debt over time instead.

The bankruptcy court for the district of Arizona came to this same conclusion in In re Garcia, 276 B.R. 627 (Bankr. D. Ariz. 2002). In Garcia, Judge Haines issued a meticulously-reasoned decision finding that "cure deal[s] with past defaults, whereas the modifications permitted (or prohibited) by § 1322(b)(2) concern future obligations." Id. at 635. He concluded that debtors who obtained their property in violation of a due-on-sale contract and

13

who proposed to pay arrearages through their Chapter 13 plan

> [were] not seeking any modification of the Bank's rights under its [contract], because they [were] not seeking to modify their future obligations that arise under the [contract] post-confirmation. They are not, for example, seeking to change the amount of each future month's installment payment, nor the right to sell the property in violation of the due on sale clause. Those would be forward-looking modifications that are prohibited by § 1322(b)(2).
>
> Instead, they are seeking to deal with a past default, a prepetition default, arising from their prepetition purchase of the property without obtaining the Bank's consent. The analysis above demonstrates that the ability to deal with prepetition defaults, without modifying future obligations, is governed by §§ 1322(b)(3) and (b)(5).

The bankruptcy court for the District of South Carolina had reached a similar, albeit more tersely-reasoned, conclusion the previous year in <u>In re Trapp</u>, 260 B.R. 267, 271-272 (Bankr. D. S.C. 2001). And the Seventh Circuit held some twenty-five years ago that "the power to 'cure' a default provided by § 1322(b)(5) permits a debtor to de-accelerate the payments under a note secured by a residential mortgage." <u>In re Clark</u>, 738 F.2d 869, 874 (7th Cir. 1984).

The Court acknowledges that bankruptcy courts are divided on this issue, and that there is a line of cases concluding that a debtor who obtains property in violation of a due-on-sale clause cannot use a Chapter 13 plan to pay arrearages on that debt. *See, e.g.*, <u>In re Threats</u>, 159 B.R. 241, 243 (Bankr. N.D. Ill. 1993), <u>In re Martin</u>, 176 B.R. 675, 676 (Bankr. D. Conn. 1995); <u>In re Allen</u>, 300 B.R. 105 (Bankr. D. Dist. Col. 2003). But these decisions, in this Court's humble view, are based less on an argument proving that such plans

14

modify the creditor's rights, and more on a concern regarding the appropriate "cure" for the pre-petition default. They opine that the only way to "cure" the original mortgagor's "default" of transferring the property without the mortgagee's consent is to divest the debtor of his or her ownership interest, return the property to the original mortgagor, and thus divest the creditor of its claim in the debtor's bankruptcy proceeding. *See, e.g.,* In re Allen, 300 B.R. at 118 ("'cure' means restoring the parties to the position they would occupy but for the default"); In re Tewell, 355 B.R. 674, 682 (Bankr. N.D. Ill. 2006) ("[a] 'cure' here would require restoring full title to . . . the original mortgagor").

This Court disagrees. First, as Judge Haines found in Garcia, this argument implies that a debtor cannot cure a non-monetary, pre-petition default through a plan, which contrasts with § 1322(b)(3)'s assurance that a Chapter 13 plan can cure or waive "any" default. In re Garcia, 276 B.R. at 636-637. Further, as Judge Haines notes, § 1322(e) appears to contemplate that most, if not all, defaults will be cured in monetary terms, when it refers to the "amount necessary to cure the default" being determined in accordance with the contract and with applicable nonbankruptcy law. Id. at 642.

Second, and more specific to the facts of this case, the argument allows a creditor who knows that a mortgagor has violated a due-on-sale clause but turns a blind eye as long as the payments to suddenly, and in this Court's view, disingenuously become concerned with its due-on-sale "rights" once the debtor files for bankruptcy. Under those circumstances, it also seems

15

disingenuous for such a creditor to be able to the § 1322(b)(2), "our-rights-are-being-modified-and-we're-shocked" argument to block plan confirmation. Granted, some creditors might not become aware of the violation of a due-on-sale clause until after the transferee files for bankruptcy protection. But, as in this case, there are those creditors who are aware of the violation, and even complicit in it, as occurred in this case. Allowing those creditors–who were not the slightest bit concerned with the violation of their due-on-sale rights when the transferee was making the payments–to try to vindicate those rights after the fact in the bankruptcy context does not seem to this Court to pass the smell test.

**C.      The Debtor in this Case May Cure the Prepetition Default Through the Chapter 13 Plan.**

As discussed above, this Court concludes that a debtor who obtained property in violation of a due-on-sale clause can propose to pay the arrearages on that property through a Chapter 13 plan via §§ 1322(b)(3) and (b)(5), without running afoul of the anti-modification provision of § 1322(b)(2). The facts in this case support that legal conclusion.

The evidence indicates that the creditor's agent, Tisha Morgan, was the person who suggested that the debtor and Mr. Sekuris apply for the mortgage in Carolyn Sekuris' name and then immediately transfer the property to the debtor and Chad via quit-claim deed. In short, not only did the creditor not

16

object to the violation of the due-on-sale clause–the creditor suggested the violation and enabled the violation to occur. The creditor had actual knowledge of the violation, yet issued not one complaint about it until the debtor filed her bankruptcy petition. As Judge Haines notes in Garcia, this "suggests that all [the creditor] was really concerned about was the money," and "not the sanctity of the personal relationship between lender and borrower." In re Garcia, 276 B.R. at 641. For the creditor to come in after the debtor filed the petition and argue that the debtor obtained the property in violation of the due-on-sale clause when it was the creditor who suggested and aided that very violation is, as the Court indicated above, disingenuous.

Unquestionably the creditor has a right to be paid on the loan. The creditor will receive those payments during the pendency of a Chapter 13 case–both arrearage payments and on-going mortgage payments. And if it does not receive those payments, it will be able to enforce its right to payment either through obtaining relief from the stay or through the dismissal of the case. But the Court concludes that the creditor cannot enforce its rights under the due-on-sale clause–which were violated well before the debtor filed for bankruptcy, and with the creditor's knowledge and assistance–by objecting to confirmation of the plan under § 1322(b).

### III. **CONCLUSION**

For the reasons discussed above, the Court hereby **OVERRULES** creditor CSMC, Inc.'s objection to confirmation.

# # # # #